IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

Kecia Newton,

        Plaintiff,

v.                                    Case No. 17-cv-2043-JWL

The Unified Government of Wyandotte
County and Kansas City, Kansas,

        Defendant.

## MEMORANDUM & ORDER

Plaintiff filed this lawsuit against her former employer alleging that defendant terminated her employment on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. In addition, plaintiff asserts a claim under 42 U.S.C. § 1983 for deprivation of a liberty interest without due process of law. This matter is presently before the court on defendant's motion for summary judgment (doc. 40). As will be explained, the motion is granted.

I.      **Facts**

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party. Plaintiff Kecia Newton is an African-American female. Defendant is a consolidated city-county government with all powers, functions and duties of a first-class city and county under the Kansas Constitution and statutes. In February 2008, plaintiff began her employment with defendant as a customer service representative in the 3-1-1 department. In late January 2013, plaintiff transferred to the position of administrative

support specialist in defendant's Delinquent Real Estate Office.  The primary responsibility of the Delinquent Real Estate Office is to coordinate the sale of tax delinquent properties through the Wyandotte County District Court and, in her position, plaintiff supported the tax sale process through the district court.

By way of background, a property is eligible to be placed in a tax sale if the taxes on the property are three or more years delinquent.  Employees known as "abstractors" in the Delinquent Real Estate Office apply pre-determined criteria to decide which properties go into a tax sale. They then conduct a title search on each property and prepare a report on the property, which is forwarded to an administrative specialist, who slots each property into the tax sale and assigns it a case number.  The filing of a court petition initiates the formal tax sale process, which is followed by service on the property owners.  Once a property has been placed in a tax sale, the owner has three options for getting it out:  the owner can redeem the property by paying the taxes in full; the owner can pay half the taxes and enter into a payment plan for the remainder; or the owner can apply to the court for other relief, such as paying less than half the taxes and entering into a payment plan for the remainder.  The properties in the tax sale are sold at public auction.  If a property changes ownership, it remains in the tax sale until the court has taken it out or the new owner has entered into a payment plan with the Treasurer.  Changes to the status of a property that is delinquent or in a tax sale are entered into a program known as CIC (short for CIC Tax Administration Solution).

Plaintiff was responsible for slotting properties for tax sales, sending out notices to County citizens whose properties were in the sales, setting citizens' requests for a court hearing on a docket sheet, communicating with the judge about dates and times for court hearings, updating

2

files in relation to the tax sales, and walking people down to the Treasurer's Office to schedule payment plans. In October 2014, plaintiff began receiving out-of-class pay for performing the duties of the vacant administrative coordinator's position. As an acting administrative coordinator, plaintiff handled legal paperwork, filed Sheriff's deeds, and was responsible for ensuring that notices were timely sent or published.

According to defendant, plaintiff's ultimate termination arose out of plaintiff's acquisition of three specific properties in the tax sale process. The first property was a residential property owned by Robert Banks and the property was included in Tax Sale No. 331. In May 2014, Mr. Banks came to plaintiff's office and asked whether she knew anyone who would be interested in purchasing the property. Plaintiff offered to purchase the property and, on May 14, 2014, plaintiff paid Mr. Banks $300 for the property and Mr. Banks and his wife, an elderly couple, executed a Quit Claim deed in which they conveyed the property to plaintiff. Plaintiff then accessed the CIC program and, for the property in question, made the following entry: "Tax Sale Number 331/161—Remove. Pay agreement. Do not put in sale." Plaintiff admits that when she made this entry, she had not entered into a pay agreement for the delinquent taxes and she never entered into a pay agreement at any time thereafter. Plaintiff further admits that she did not pay any taxes owed on the property and the property never went back into a tax sale while she owned it. In June 2015, plaintiff conveyed the property by Quit Claim deed to another individual for $5000. Plaintiff does not know of anyone else in the Delinquent Real Estate Office who had ever purchased a property from a citizen who came to the office seeking assistance. She did not ask anyone whether it was permissible for her to purchase property from County citizens.

3

Around the same time that she conveyed the first property to another individual, plaintiff acquired a second property from a citizen who had come to her office. Doris Perez's residential property had gone through a tax sale but did not sell. In June 2015, Ms. Perez came to plaintiff's office and executed a Quit Claim deed conveying the property to plaintiff. Plaintiff paid Ms. Perez nothing for the property and she testified that Ms. Perez gave the property to her as a gift. Plaintiff had not met Ms. Perez prior to Ms. Perez coming to her office in June 2015. During the summer of 2015, plaintiff placed the property on the market for approximately $30,000 and ultimately leased the property for $650 per month beginning October 1, 2015.[1]

In mid-September 2015, plaintiff sent a letter to Marilyn Hopkins expressing an interest in purchasing Ms. Hopkins' residential property. In her letter, plaintiff told Ms. Hopkins that her property was behind on taxes and that it was "set to go into a tax sale." Plaintiff indicated that she was willing to pay the delinquent taxes on the property, have it removed from tax sale eligibility and "get it out of the current owner's names." Plaintiff testified at her deposition that the likelihood of the property going into a tax sale was "slim to none" and that she did not actually check to see if the property was scheduled to go into a tax sale prior to sending the letter to Ms. Hopkins. On September 22, 2015, plaintiff met Ms. Hopkins in Topeka, Kansas, where Ms. Hopkins executed a Quit Claim deed conveying the property to plaintiff. Plaintiff paid $1000 for the property and, the next month, conveyed the property to another individual for $1000. Plaintiff testified that she intended to renovate the property before selling it, but realized that the

---

[1] While plaintiff eventually paid the back taxes owed on the property, she did so only after the termination of her employment.

4

renovations required were too expensive, so she sold the property quickly without realizing a profit on it.

On August 11, 2015, the police department was notified by defendant's Legislative Auditor's office that plaintiff was acquiring properties from citizens who had fallen behind on their taxes and whose properties had been set for auction.[2]    The Wyandotte County District Attorney's Office requested that the police department's Internal Affairs unit investigate plaintiff's conduct and Detective Pamela Waldeck conducted that investigation.[3]  In the course of her investigation, Detective Waldeck interviewed Mr. Banks, Ms. Perez and Ms. Hopkins as well as other employees in the Delinquent Real Estate Office.  Based on her investigation, Detective Waldeck furnished the district attorney with an Affidavit for Application for Warrant and, on October 16, 2015, she and another detective met with plaintiff at plaintiff's office, which was located in the Wyandotte County Courthouse.  Plaintiff declined to give a statement.  She was then arrested and booked into the Wyandotte County Detention Center.  Plaintiff was charged in Wyandotte County District Court with one count of computer crime and three counts of official misconduct, all arising out of plaintiff's acquisition of the three tax-delinquent properties.  She was released on a $20,000 bond.  Following a preliminary hearing, plaintiff was bound over for trial on the charges.

---

[2] The record does not reflect how the Legislative Auditor's office became aware of plaintiff's acquisition of the properties.
[3] Plaintiff objects to the facts contained in Detective Waldeck's affidavit on hearsay grounds.  The objection is overruled.  The contents of the statements offered in the affidavit are offered not to prove the truth of those statements but to show defendant's motivation in ultimately terminating plaintiff's employment.

In a letter dated October 21, 2015, Brett Deichler, defendant's Director of Delinquent Real Estate/311 Operations, informed plaintiff that she was suspended without pay pending the resolution of the criminal charges filed against her and the completion of an internal administrative investigation.  Renee Ramirez, defendant's Director of Human Resources, had assisted the police department with its investigation into plaintiff's conduct and Detective Waldeck provided Ms. Ramirez a copy of the investigative file concerning plaintiff's acquisition of the three properties so that Ms. Ramirez could determine independently whether any violations of defendant's policies and procedures had occurred.  Detective Waldeck's investigation had also uncovered that plaintiff had been operating a credit counseling business out of her office in the Delinquent Real Estate Office.  Ms. Ramirez's internal investigation focused primarily on whether and to what extent plaintiff was operating a private credit counseling business in defendant's workplace.

On May 6, 2016, Ms. Ramirez sent a memorandum to Assistant County Administrators Melissa Mundt and Joe Connor in which she recommended the termination of plaintiff's employment for a variety of ethics and policy violations.  On May 20, 2016, a Wyandotte County district judge dismissed the charges against plaintiff.  The record is silent as to the reasons underlying that dismissal.  On June 8, 2016, Dennis Laughlin, defendant's General Services Director, met with plaintiff in person and notified her that her employment was terminated.  Mr. Laughlin provided plaintiff with a letter at that time indicating that defendant had terminated her employment based on multiple ethics and policy violations.  In pertinent part, the letter stated as follows:

> You used your official position in the Delinquent [Real Estate] Department to obtain title to properties scheduled for tax sale . . . at no cost or at a cost well below market value, then removed the properties or arranged to have them removed from the tax

6

sale.  You did not pay the delinquent taxes or enter into payment plans on any of these properties, deliberately circumventing the policy that requires payment of a portion of the taxes due or a court order and entry into a payment plan before property can be removed from a tax sale. . . .  After acquiring the properties, you sold them or posted them for sale at prices far exceeding what you had paid for them.  Further, you were dishonest with the property owners, who were elderly and vulnerable.  You failed to inform the property owners of the established procedures for removing their properties from the tax sale, misled them into believing that their only recourse was to deed the properties to a third party, namely you, and falsely represented to them that you would pay the delinquent taxes owed on the properties.

The letter further identified plaintiff's operation of a private credit counseling business in defendant's workplace during her working hours and her use of defendant's resources to do so.  Finally, the letter indicated that a copy of the pertinent grievance procedure for union members was attached.

Plaintiff was a member of the American Federation of State, County and Municipal Employees Local No. 3475 of Missouri/Kansas State Council No. 72 (AFSCME Local 3475).  Plaintiff filed a grievance of her termination under the grievance procedure in the Memorandum of Agreement between defendant and AFSCME Local 3475.  Pursuant to that process, plaintiff's grievance was filed with her department head, Dennis Laughlin, who had replaced Mr. Deichler.  On June 22, 2016, Mr. Laughlin denied the grievance in writing in great detail, emphasizing again that plaintiff "took advantage of [her] position in the Delinquent Real Estate Office to obtain titles to the properties" and that she had abused the public's trust and the government's trust by doing so.  Plaintiff appealed the denial of her grievance and, on July 12, 2016, a third-step grievance hearing was held before Joseph Connor, Assistant County Administrator.  In a July 29, 2016 memorandum to County Administrator Doug Bach, Mr. Conner recommended that plaintiff's grievance be denied.  Mr. Connor's recommendation was based on plaintiff's use of her position

to further her private interests and to engage in transactions that constituted conflicts of interest and plaintiff's operation of a private business. That same day, Mr. Bach informed plaintiff that her grievance was denied. Plaintiff did not request arbitration of her grievance as provided in step four of the grievance procedure.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.    Race Discrimination

In the pretrial order, plaintiff asserts that defendant terminated her employment on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[4] Plaintiff concedes that she has no direct evidence of discrimination, and her claim is therefore analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 627 (10th Cir. 2012). Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id*. To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id*. (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)). If she establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If defendant meets this burden, summary judgment against plaintiff is warranted unless she introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id*. (citing *Simmons v. Sykes Enters*., 647 F.3d 943, 947 (10th Cir. 2011)).

Because defendant assumes for purposes of its motion that plaintiff has established a prima facie case, the court turns first to whether defendant has met its burden to articulate a legitimate, nondiscriminatory reason for plaintiff's discharge. "This burden is one of production, not

---

[4] The pretrial order also references race discrimination claims based on defendant's "prohibiting [plaintiff's] access to exculpatory evidence" and "investigating allegations against [plaintiff] after the case against her was dismissed for lack of merit." Defendant moves for summary judgment on these claims on the grounds that plaintiff never asserted those claims in her charge of discrimination such that she has failed to exhaust her administrative remedies and, in any event, the claims lack evidentiary support. Plaintiff does not address these claims in any respect in her response and the court deems them abandoned.

persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here. *See id.*  According to defendant, plaintiff's employment was terminated based on the results of defendant's internal investigation finding that plaintiff violated defendant's Code of Ethics and various government policies.  Defendant's evidence reflects that the primary reason for plaintiff's termination was plaintiff's "dishonesty" with respect to acquiring three tax-delinquent properties from citizens and using her position in the Delinquent Real Estate office for private financial gain.  The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reasons are pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances."  *Id.* at 1150 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).  A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011).  In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing."  *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).  In determining whether the proffered reason is pretextual, the court examines "the facts as they appear to the person making the decision, not as they appear

to the plaintiff." *Id*. The court does not "ask whether the employer's proffered reasons were wise, fair or correct" but only whether "the employer honestly believed those reasons and acted in good faith upon those beliefs." *Id*.

Plaintiff contends that a reasonable jury can find pretext in this case by comparing defendant's treatment of her with its treatment of five non-African-American employees for what she deems "the same transgressions," although she candidly admits that she has no evidence that any other employee ever utilized his or her position for personal financial gain. Evidence that a similarly situated employee received better treatment can suggest that the employer's alleged nondiscriminatory reason is pretextual. *Roberts v. International Business Machines Corp*., 733 F.3d 1306, 1310 (10th Cir. 2013). As the Circuit has explained, however, "to provide a basis for reliable comparison, the other employee must, in fact, be similarly situated—that is, reporting to the same supervisor, held to the same standards, and afoul of those standards to at least the same degree. And it falls on the employee alleging discrimination to rule out alternative explanations for the differential treatment." *Id*. (citing *Timmerman v. U.S. Bank, N.A*., 483 F.3d 1106, 1120-21 (10th Cir. 2007)). As will be explained, plaintiff's comparison is not reliable and fails to permit an inference of pretext.

Plaintiff asserts that two of her supervisors, Dennis Laughlin and Brett Deichler, committed transgressions and were not disciplined in any respect. She avers that Mr. Laughlin had his entire staff, including plaintiff, over to his house on "company time" and then "falsified" the staff's time sheets to "make it as if we were at the office conducting work [when] we were not." She testified that Mr. Deichler, while he was the department head responsible for the Delinquent Real Estate office, used defendant's computer to create a website and file a patent relating to a private business

11

he started. She also testified that Mr. Deichler took calls from investors on company time. Plaintiff's comparison to these supervisors does not establish pretext. As her supervisors, Mssrs. Laughlin and Deichler are not similarly situated to plaintiff. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 752–53 (10th Cir. 2000) (nonsupervisory employees generally not deemed similarly situated to supervisory employees with respect to disciplinary matters). Moreover, plaintiff has no evidence that defendant had any knowledge of Mr. Laughlin's or Mr. Deichler's actions. *See Timmerman*, 483 F.3d at 1121-22 (in the absence of evidence that employer had knowledge of misconduct of another employee, lack of knowledge, and not discriminatory animus, explained disparate treatment). Finally, no reasonable jury could conclude that the alleged misconduct of Mssrs. Laughlin and Deichler is comparable in seriousness to the transgressions committed by plaintiff. There is no evidence that Mr. Laughlin or Deichler misused their positions for personal financial gain or misled members of the public. For all of these reasons, the disparate treatment of these two supervisors compared to plaintiff does not permit an inference of discriminatory animus or pretext.

Plaintiff also contends that Diana Alvarado received no discipline after engaging in misconduct. The only evidence relied upon by plaintiff to support this assertion is a single sentence in plaintiff's affidavit that states, in its entirety, as follows: "No action has been taken against Diana Alvarado, a Hispanic female, who forged a deed to remove a property from one person's name to the next." The record is devoid of any evidence from which it might be inferred that plaintiff has personal knowledge of this purported misconduct or defendant's purported failure to discipline Ms. Alvarado for it. There is no evidence remotely touching on issues such as Ms. Alvarado's position or supervisor, which department she worked in, or whether defendant

12

had knowledge of the purported misconduct. In short, there are simply no facts presented by plaintiff that inform the inquiry as to whether she and Ms. Alvarado are similarly situated. Based on the conclusory sentence provided by plaintiff, however, there is no suggestion that Ms. Alvarado misused her position for personal financial gain.

Lastly, plaintiff contends that Lori Flack and John Hooser, both Caucasian employees who worked in the Delinquent Real Estate Office, committed transgressions of comparable seriousness and were not disciplined. Plaintiff testified that Ms. Flack, on several occasions, padded her time sheets and that plaintiff reported her for that conduct but that no disciplinary action was ever taken; that Ms. Flack reported to work intoxicated on one occasion; and that Ms. Flack used defendant's computer at home for her personal use. She avers that Mr. Hooser was "drinking on company time" and was caught watching pornography on defendant's computer during working hours but that no disciplinary action was taken. But plaintiff has not established any personal knowledge of or offered any evidence concerning whether Ms. Flack or Mr. Hooser were disciplined for any of these purported transgressions. Moreover, no reasonable jury could conclude that the misconduct described by plaintiff is comparably serious to plaintiff's misconduct. There is no suggestion that Ms. Flack or Mr. Hooser used their official positions at work for personal gain; misled members of the public in any respect; or operated a private business on company time with company resources. There is no suggestion that Ms. Flack or Mr. Hooser engaged in any violations of defendant's Code of Ethics, which prohibits the use of public office for personal or private gain. In the absence of such evidence, plaintiff cannot establish that Ms. Flack or Mr. Hooser are similarly situated to her for purposes of establishing pretext.

Plaintiff does not articulate any other argument in support of pretext, other than to suggest that she does not believe she violated any of defendant's policies or committed any wrongdoing and that she never tried to hide the fact that she was acquiring and then selling tax-delinquent properties. But in the absence of evidence that the decisionmakers did not honestly believe that plaintiff's conduct amounted to an ethical violation serious enough to constitute termination, plaintiff's argument fails. *See Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1307-08 (10th Cir. 2017) (evidence that employer used poor business judgment or "got it wrong" is insufficient to establish pretext; issue is whether employer honestly believed the reasons it gave for termination and acted in good faith on those beliefs). Ultimately, the court concludes that the facts of this case, viewed in the light most favorable to plaintiff, do not give rise to an inference of pretext in the context of plaintiff's discrimination claim. Plaintiff, then, has failed to meet her burden of demonstrating pretext and summary judgment in favor of defendant is warranted on plaintiff's claim of race discrimination.

## IV.    Section 1983 Claim

In the pretrial order, plaintiff sets forth a claim pursuant to 42 U.S.C. § 1983 in which she asserts that defendant violated her Fourteenth Amendment rights by depriving her of a liberty interest in her good name and reputation without due process.[5] The government infringes upon a public employee's liberty interest in his or her good name and reputation when: (1) it makes a

---

[5] In the pretrial order, plaintiff does not actually allege a due process violation; she alleges only a liberty interest deprivation. Without objection from defendant, the court construes the claim as asserting a due process violation.

statement that impugns the good name, reputation, honor, or integrity of the employee; (2) the statement is false; (3) the statement is made during the course of termination and forecloses other employment opportunities; and (4) the statement is published, in other words disclosed publicly. *See McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014) (citing *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994)); *see also Sipes v. United States*, 744 F.2d 1418, 1421 (10th Cir. 1984) (to state a liberty deprivation claim, plaintiff must show that dismissal resulted in the publication of information that was false and stigmatizing). If a public employee can show that his or her liberty interest in his or her good name and reputation was damaged, due process affords an adequate name-clearing hearing. *McDonald*, 769 F.3d at 1213. A name-clearing hearing "gives the plaintiff an opportunity to hear and answer firsthand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation." *Id.*

Defendant contends that summary judgment is warranted on this claim for several independent reasons, including plaintiff's failure to come forward with evidence that defendant "published" any stigmatizing information about plaintiff in connection with her dismissal and plaintiff's failure to establish that any deprivation occurred without due process.[6] Defendant is correct that the record reflects no evidence that any allegedly stigmatizing information concerning plaintiff was made public by defendant. *See Rich v. Sec'y of the Army*, 735 F.2d 1220, 1227 (10th Cir. 1984) (stigmatizing information must be made public by offending government entity). There is evidence that the district attorney "published" information about plaintiff by filing criminal

---

[6] While defendant raises additional arguments in support of its motion for summary judgment on this claim, the court declines to address those arguments because summary judgment is so clearly warranted on the grounds discussed herein.

15

charges against her, but the district attorney is not an officer of defendant.  *See* K.S.A. § 22a-101(a) (county district attorney is not deemed an officer of county).  There is evidence that Detective Waldeck forwarded information to the district attorney and provided an affidavit to the district attorney in support of a warrant for plaintiff's arrest, but the Circuit has held that "intra-government dissemination" of information falls short of the notion of "publication" for purposes of a liberty interest claim.  *See Ellison v. Roosevelt County Board of County Commr's*, 700 Fed. Appx. 823, 832 (10th Cir. July 12, 2017) (citing *Asbill v. Housing Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir. 1984)).

While the nature of plaintiff's publication theory is unclear, she seems to suggest that defendant "published" stigmatizing information about her by virtue of the fact that she was arrested at work by defendant's police officers, who then escorted her out of the building.  Even assuming that this conduct could be construed as "publication," there is no evidence that the arrest and escort on October 16, 2015 occurred in the course of her termination, as required for a liberty interest claim.  *See Sipes*, 744 F.2d at 1421 (to establish liberty interest, plaintiff must show that she was stigmatized "in connection with an alteration of her legal status as an employee"); *McDonald*, 769 F.3d at 1212 (publication must occur during course of termination).  Plaintiff's employment was not terminated until the conclusion of the internal investigation in June 2016, many months after her arrest.  Moreover, plaintiff's arrest was based on criminal charges filed by the district attorney; plaintiff's termination, which occurred after the criminal charges were dismissed, was based on ethics violations as determined by defendant's internal investigation.  *See Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723, 727 (10th Cir. 2000) (in determining whether defamatory statement is made in the course of an employee's termination, court examines

the manner in which plaintiff is terminated and any statements made "incident" to the termination). Because plaintiff directs the court to no stigmatizing statements published by defendant in connection with the termination of her employment, summary judgment on her claim is appropriate.

But even assuming that plaintiff could show that defendant deprived her of a liberty interest in her good name and reputation, she cannot show that the deprivation occurred without due process. It is uncontroverted that the collective bargaining agreement ("CBA") between defendant and the AFSCME Local 3475, of which plaintiff was a member, provides for a grievance process that includes, at the fourth step, an arbitration before a mutually agreeable arbitrator. It is further uncontroverted that plaintiff, despite having knowledge of the grievance process and her right to arbitrate her grievance, never requested arbitration of her grievance or otherwise notified defendant of an intent to arbitrate her grievance. She does not allege that defendant prevented her from pursuing arbitration. She complains only that the arbitration hearing contemplated by the CBA is a "back room," "private, closed door" hearing that would not have allowed her the opportunity to clear her name.[7]

Plaintiff's arguments are foreclosed by Tenth Circuit precedent. In fact, the Tenth Circuit has recognized that due process is satisfied by the opportunity for an arbitration hearing pursuant

---

[7] Because plaintiff does not assert a due process violation in the pretrial order, it sheds no light on whether plaintiff is challenging the pre-termination process she was provided, the post-termination process she was provided, or both. Because plaintiff's response to the motion for summary judgment focuses solely on the CBA's grievance procedure, the court construes plaintiff's claim as one challenging the adequacy of defendant's post-deprivation process. In any event, the facts demonstrate that plaintiff was provided a pre-deprivation opportunity to be heard through defendant's internal investigation and the June 8, 2016 termination meeting with Mr. Laughlin.

to a collective bargaining agreement. *See McDonald,* 769 F.3d at 1214 (identifying "other scenarios" that satisfy due process, including arbitration hearing pursuant to CBA); *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998) (CBA's grievance procedure satisfied plaintiff's entitlement to post-deprivation due process).  Despite the private nature of an arbitration hearing, if plaintiff had prevailed at the hearing, she would have been reinstated to her position which necessarily would have cleared her name.  Because plaintiff undisputedly refused to take advantage of an adequate post-deprivation remedy that was available to her, she cannot establish a due process violation.  *See McGee v. Boren*, 58 Fed. Appx. 436, 438 (10th Cir. Feb. 13, 2003) ("If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.") (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).  The court grants summary judgment in favor of defendant on this claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 40) is granted.

**IT IS SO ORDERED.**

Dated this 26th  day of June, 2018, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

18